## CITY NAT. BANK OF FAIRMONT v. FIDELITY MUT. LIFE INS. CO.

### No. 6599.

United States Court of Appeals Fourth Circuit.

Argued June 15, 1953.

Decided Aug. 8, 1953.

William P. Lehman, Fairmont, W. Va. (John D. Amos, Fairmont, W. Va., on the brief), for appellant.

C. H. Hardesty, Jr., and Russell L. Furbee, Fairmont, W. Va. (Furbee & Hardesty, Fairmont, W. Va., on the brief), for appellee.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

DOBIE, Circuit Judge.

The City National Bank of Fairmont, (hereinafter called the Bank), instituted, in the United States District Court for the

Northern District of West Virginia, a civil action, sounding in tort, against The Fidelity Mutual Life Insurance Company (hereinafter called Fidelity), to recover damages for the alleged fraud, deceit or misrepresentation of Fidelity. The District Judge found (1) that the Bank's cause of action was barred by the statute of limitations; (2) that the Bank had established no actionable claim of fraud, deceit or misrepresentation against Fidelity. The Bank has appealed to us.

There is little or no dispute about the facts in this case, which are somewhat complicated. Fidelity, through its general agent, Hupp, at Fairmont, West Virginia, had issued a policy of insurance upon the life of Donald P. Ave Lallemant for $48,000, payable at his death to his wife, Marjorie H. Ave Lallemant, if living, otherwise to his son, John D. Ave Lallemant. Prior to October 25, 1948, Lallemant and his wife came to the conclusion that their marital difficulties were irreconcilable. They accordingly entered into a separation agreement.

About the same time, Lallemant executed and delivered to his wife an assignment of this policy on a form furnished by Fidelity. He did not deliver the policy to his wife but stated that it had been inadvertently left in his safe deposit box. His wife was told that the policy would be delivered to her within ten days. It was also stipulated in writing that the policy would be delivered to the wife's attorney within that time.

On October 27, 1948, counsel for Mrs. Lallemant wrote a letter to Fidelity, giving notice of the separation agreement and this assignment, and stating that, within a few days, the policy and collateral assignment would be sent to Fidelity by registered mail. This communication was promptly acknowledged by Fidelity in a letter signed by Vincent Keesey, its assistant counsel, in which it was suggested that the assignment be signed by both the insured and the beneficiaries under the policy, or that a change of beneficiary form be executed, in which event the assignment need be executed only by the insured.

Upon receipt of this letter from Fidelity, Lewis, one of counsel for Mrs. Lallemant,

talked by telephone to Keesey and discussed with him the import of the letter, agreeing in some instances and disagreeing in others, as to the terms thereof, promising, however, to comply if possible and as soon thereafter as conditions could be met. Apparently nothing further was done until January 17, 1949, when Keesey again wrote to counsel for Mrs. Lallemant. In this letter, Keesey stated:

"We have had no further word from you about the matter. I presume you are aware of the policy provisions that the Company will not be charged with notice of any assignment until the assignment in duplicate has been filed at this office for record. I would suggest that you urge the parties to request change of beneficiary as suggested, and see that both copies of the assignment are sent here for record. After that is done, we will return the duplicate copy of the assignment, properly endorsed, to show it has been recorded."

Upon receiving this letter, Lewis again telephoned Keesey, telling him that he was trying to comply with defendant's demands, though he felt that all the formalities suggested by Keesey were not necessary since the policy had been assigned and in his opinion this was all that would be legally required. On February 16, 1949, Lewis again wrote to Keesey that every effort was being made to comply with Keesey's requests and that he hoped to have the matter completed soon.

Counsel for Mrs. Lallemant were never able to secure the original policy or to get a duplicate of the assignment and at no time received any cooperation from Lallemant or his attorney. A copy of the separation agreement was not given to Fidelity. Lewis had told Keesey that when Lewis received the policy, he would send it and the assignment papers together to Fidelity.

On March 3, 1949, Lallemant went to the office of Hupp for assistance and advice in securing a loan. Hupp discussed at length with Lallemant the correspondence between Hupp and Keesey concerning the policy and the alleged assignment to Mrs. Lalle-

mant. Lallemant hold Hupp that the purported agreement between his wife and himself had not been finally determined and that the negotiations had been broken off. Hupp then inquired of Edwin C. Griswold, Vice President of the plaintiff, with whom he was personally acquainted, whether Lallemant could obtain a loan of $5,000 on the $48,000 insurance policy which at that time had a cash surrender value of more than $5,000, and made an appointment with the bank officials for the following day. Hupp then telephoned Keesey in Philadelphia to inquire "whether there was any assignment on file, or record, against this policy." Keesey told Hupp that he didn't believe there was an assignment on record but that he would examine the file and would send a telegram. That same afternoon, Hupp received from Keesey this telegram: "No assignment of policy 657697 Ave Lallemant on file here."

On March 4, 1949, Hupp took Lallemant to the Bank and introduced him to Griswold, Vice President, and to Carl Springer, cashier of the Bank. The original insurance policy of $48,000 was produced by Lallemant. Griswold then asked Lallemant if the policy was free and clear of incumbrances; Lallemant answered in the affirmative. Griswold then turned to Hupp and asked Hupp what he knew about it and as to the existence of any assignment against the policy. To this Hupp replied that he had a telegram from the home office of Fidelity to the effect that it was clear of any assignment on record. Hupp, though fully acquainted with the alleged previous assignment of the policy to Mrs. Lallemant, through correspondence with Keesey and discussions with Lallemant, failed utterly to disclose to the bank officials anything about this previous assignment of the policy to Mrs. Lallemant.

Thereupon the Bank lent Lallemant the sum of $5,000 on his note, dated March 4, 1949, payable within 60 days and accepted as collateral therefor an assignment of the insurance policy. This assignment, properly executed, was transmitted to Fidelity by Hupp, and was received and filed in due course. At such time there was no formal record of a prior assignment of the policy

at the home office of Fidelity.

On March 8, 1949, Keesey, on behalf of Fidelity, wrote to counsel for Mrs. Lallemant this letter:

"You will remember we have had some correspondence with you respecting a proposed assignment of the above numbered policy. However, to date, we have not received any assignment of the policy from you. I can advise you we have just received through our Fairmont, West Virginia, office an assignment of this policy dated March 4, 1949, executed by the insured naming City National Bank of Fairmont, West Virginia, assignee of the policy."

On March 10, 1949, counsel for Mrs. Lallemant sent to Fidelity the assignment of the policy to her. This assignment bore the date of October 26, 1948.

Lallemant defaulted in the payment of his note to the Bank, which, on May 3, 1949, wrote to Fidelity requesting it to send to the Bank, under Lallemant's assignment of the policy to the Bank, the amount of the note. Thereupon, on May 9, 1949, Fidelity advised the Bank of the adverse claim of Mrs. Lallemant and notified the Bank, under these circumstances, Fidelity was unwilling to pay either claimant until their equities were established.

On June 24, 1949, the Bank filed, in the Circuit Court of Marion County, West Virginia, a notice of motion for judgment against Fidelity and Lallemant for the sum of $5,000, the amount of the note, together with interest and costs. Whereupon, on June 29, 1949, in the District Court of the United States, for the Northern District of West Virginia, at Fairmont, Fidelity filed an action of Interpleader, pursuant to the provisions of Section 1335, Title 28, United States Code, naming as defendants the Bank and Donald P. and Marjorie H. Ave' Lallemant.

That same day, District Judge Baker enjoined the Bank "from instituting or prosecuting any other suit or proceeding against the plaintiff (Fidelity) in any State Court or in any other Federal Court on account of the Policy of Insurance issued by the plaintiff."

The Bank filed its answer in the interpleader action July 22, 1949; Lallemant filed his answer August 1, 1949; Mrs. Lallemant filed her answer August 23, 1949, and filed an amended answer March 9, 1950, in her remarried name of Marjorie H. O'Flynn.

At the time of the filing of the Interpleader action, Fidelity gave bond with approved surety which was accepted. On March 6, 1949, Fidelity paid into court $5,822.83, the cash surrender value of the policy. On April 6, 1950, Fidelity was dismissed as a party to the Interpleader action, leaving the priority of the respective claims of the Bank and Mrs. Lallemant to be determined by the court.

The Interpleader action was tried April 6, 1950. On December 30, 1950, District Judge Watkins filed his opinion, in which he decided against the Bank, and in favor of the wife. Fidelity Mutual Life Insurance Co. v. City National Bank of Fairmont, D.C., 95 F.Supp. 276. No appeal from this judgment was taken by the Bank.

The order of the District Court entered on January 9, 1951, further provided that the injunction theretofore awarded at the time of the institution of the Interpleader action be made perpetual insofar and to the extent only that said injunction applied to prosecuting any action against Fidelity, arising contractually under Insurance Policy No. 657697, or to recover said fund of $5,822.83, or any part thereof, deposited in the registry of the Court, arising under said insurance policy, but said injunction was not further or otherwise perpetuated.

On September 10, 1951, motions were made in the Circuit Court of Marion County, West Virginia, as a result of which judgment in favor of the Bank was taken against Lallemant to the amount of the loan, including interest and costs. Execution thereupon was returned unsatisfied. The Bank instituted the instant civil action September 21, 1951.

One of the terms of the policy of insurance reads as follows:

"Assignment.—No Assignment shall be binding upon the Company until the original or a duplicate thereof is filed at its Head Office. The Company assumes no obligation as to the effect, sufficiency, or validity of any assignment."

Two questions are before us on this appeal: (1) did the Bank state and prove a valid claim, or cause of action against Fidelity; and (2) was this claim barred by the Statute of Limitations. There is some suggestion of a plea of *res adjudicata* against the Bank by virtue of the Interpleader action. We deem this last contention so obviously lacking in merit as to require no discussion by us. We discuss only the plea of the statute of limitations.

The applicable statutes of limitations of the State of West Virginia, and the interpretations placed upon these statutes by the highest court of the State of West Virginia are not entirely clear.

It seems that prior to 1949, the limitation period in West Virginia for actions for misrepresentation, fraud or deceit was 5 years, Mylius v. Arnold, 99 W.Va. 341, 128 S.E. 740; Horton v. Tyree, 102 W.Va. 475, 135 S.E. 597. The applicable statute was amended in 1949 by an act of the Legislature, effective June 7, 1949, which reduced the period to 2 years. Code of West Virginia, Ch. 55, Art. 2, § 12.

The limitation period, of course, begins to run at the time of the accrual of the cause of action. We are thus faced with the question: when did the instant cause of action accrue.

There is a line of cases holding that the cause of action accrues at the time of the commission of the wrong—here the alleged misrepresentations of Fidelity's agents. Merchants' National Bank v. Spates, 41 W. Va. 27, 23 S.E. 681; Boyd v. Beebe, 64 W.Va. 216, 61 S.E. 304, 17 L.R.A.,N.S., 660; Harper v. Harper, 4 Cir., 252 F. 39; Pickett v. Aglinsky, 110 F.2d 628. If this rule be applied, clearly Fidelity's cause of action is barred.

There is in West Virginia, however, a statute which is listed under the general heading of "Actions on Bonds of Personal Representatives and Fiduciaries Generally", Chapter 55–2–7 (5399), the pertinent part of which reads:

"The right to recover money paid under fraud or mistake shall be deemed to accrue, both at law and in equity, at the time such fraud or mistake is discovered, or by the exercise of due diligence ought to have been discovered."

There is some question as to the applicability of this statute to the instant case. But, even if this statute be applicable, it does not help the Bank. For we think that, more than two years before the instant action was instituted, the Bank, "by the exercise of due diligence," ought to have discovered the alleged "fraud or mistake."

Fidelity's letter to the Bank, May 9, 1949, advising the Bank of Mrs. Lallemant's adverse claim and of Fidelity's unwillingness to pay the Bank, certainly put the Bank on notice and should have prompted inquiry by the Bank. The Bank was fully informed upon the institution, June 29, 1949, of the Interpleader action by Fidelity. And, to clinch this matter, the answer of Mrs. Lallemant in the Interpleader action, filed August 23, 1949, fully informed the Bank of the details of her claim.

Yet, in the face of all this, the Bank did nothing. We quote from the very naive testimony of Carl Springer, cashier of the Bank:

"Q. So that you acting as the head of the bank did nothing whatsoever from the time you first received the May 9th, 1949 letter from the Company up until this Court met here in April, 1950, to find out what Mrs. Lallemant's claim was all about, that is correct? A. We were not interested in finding out what it was about because we thought our assignment was good, see.

"Q. My question is you made no effort whatsoever to find out what her claim was about, isn't that correct? A. I did not."

But we are solemnly told in the Bank's brief:

"It was not until the hearing in the interpleader action on April 6, 1950, that appellant first learned that Hupp knew of Mrs. Lallemant's adverse claim, but failed to disclose this to the appellant on March 4, 1949."

If this be true, the Bank's failure to learn sooner that Hupp knew of Mrs. Lallemant's adverse claim was due to the Bank's clear negligence and unjustifiable inaction.

■ We must, therefore, hold, as did the District Judge, that the Bank's cause of action accrued more than two years before the instant action by the Bank against Fidelity was instituted.

■ This brings us to the contention, strongly stressed by the Bank, that the injunction granted by Judge Baker in the Interpleader suit tolled the running of the statute of limitations. We agree with the District Judge that this contention is without merit.

On this point, the District Judge stated in his opinion [110 F.Supp. 517]:

"Plaintiff, in its brief admits that the subject matter of this action is not the same as the subject matter embraced in the Interpleader action, this sounding in tort, and the other being in contract. I am therefore of the opinion that the matter of the statute of limitations is narrowed down to a question of the injunctive relief granted as tolling the statute. I have purposely set out in my findings of fact the prayer for relief in the Interpleader action, together with the order of Judge Baker enjoining and restraining the further prosecution of the action of the plaintiff in the State courts in West Virginia. It is evident from a study that the plaintiff was not precluded by said restraint from instituting this action or any comparable action against the defendant to recover on the facts alleged herein, and that to have done so without authority would not have constituted a contempt of Judge Baker's order, and that upon motion made and had before him that such relief would have been granted; so that plaintiff may have been privileged to institute this action or any comparable action at any time during the pendency of the Interpleader cause."

With this we agree.

It is true that Judge Baker's injunction was somewhat indefinitely worded, restraining the Bank from "prosecuting any other suit or proceeding" against Fidelity "on account of the Policy of Insurance issued by the plaintiff" (Fidelity). Judge Baker, though, was interested only in protecting Fidelity against suits connected with the fund deposited in court by Fidelity, representing the cash surrender value of the policy. Actions against Fidelity for tortious misrepresentations as to the policy were beyond his ken and without his concern. He did not intend to prevent such actions. Indeed, we go further by stating that he had no power to issue so broad an injunction. The injunction granted by Judge Watkins was so carefully worded as to make it crystal clear that this injunction did not bar the instant action.

Our holding on the issue of the statutes of limitations is sufficient to dispose of this case and to justify affirmance of the judgment below. We, accordingly, express no opinion on the merits of this case—that is, on the validity of the Bank's claim of fraud, deceit or misrepresentation against Fidelity.

The judgment of the District Court is affirmed.

Affirmed.

SOPER, Circuit Judge (dissenting).

The discussion should begin with the statement of the established fact that the Bank has lost $5,000 through the fraud of the Fidelity Mutual Life Insurance Company, and that the only possible defense of the Insurance Company is limitations. Hupp, its agent, took an active part in securing a loan of $5,000 from the Bank for Lallemant on his $48,000 life insurance policy; and in the course of the negotiations for the loan Hupp sat quietly by and heard Lallemant offer the cashier an assignment of the policy as security for the loan and make the false statement that the policy was free and clear of encumbrances. At that time, as Hupp well knew, there was an outstanding prior assignment of the policy which Lallemant had given his wife in the course of a separation agreement.

Nevertheless Hupp allowed the false statement to stand and led the Bank to accept it by assuring the cashier that the policy was free of any assignment on record. The latter statement was literally true but the total effect of the conference, as Hupp understood, was to create the belief that no previous assignment had been given; and so the loan was made and Lallemant, being financially untrustworthy, the money was lost through the deceit of the Insurance Company.

The Insurance Company says that although all of this may be true, it cannot be compelled to make good the Bank's loss because the suit is barred by limitations. The false statements were made on March 4, 1949, but the present suit was not brought until September 21, 1951 after the lapse of more than two years which is the period of limitations prescribed by the applicable state statute. The defense is purely technical since the home office of the Insurance Company was made acquainted with the Bank's claim very soon after Lallemant defaulted in the payment of his 60 day note. The Bank sued the Insurance Company on its assignment of the policy on June 24, 1949 and the Insurance Company countered by filing an action of interpleader. All the evidence relating to the two assignments of the insurance policy was available then and is available now to all of the interested parties.

Under such circumstances it is a satisfaction to learn that there are two substantial reasons why the defense of limitations is not available to the Insurance Company. The first reason is that on June 29, 1949 the Insurance Company secured an injunction order against the Bank in the interpleader action forbidding the Bank, until the further order of the District Court, to institute or prosecute any suit against the Insurance Company "on account of said policy of insurance." It is an established rule of law that limitations do not run against a claimant if he is prevented from bringing suit by the party to be charged, and hence, while the injunction was in effect, limitations did not run as to any suit forbidden by the court. 34 Am.Jur., Limitation of Actions, §§ 187, 238.

It is said, however, that the injunction against the bringing of a suit "on the policy" did not forbid an action for fraud based on misrepresentations in regard to an assignment of the policy; and therefore the Bank should have sued the Insurance Company for fraud while it was still endeavoring to prove the validity of the assignment in the interpleader suit. This contention should not be sustained if the meaning of the injunction was unclear and might well have been taken to include any suit against the Insurance Company pertaining to the policy. It is manifest that a careful lawyer would not have advised the Bank that despite the injunction it was free to sue the Insurance Company on a cause of action which centered upon and related to the policy itself. The subsequent action of the District Judge supports this construction of the order. After the interpleader suit was decided in favor of the wife on December 30, 1950 the District Judge entered a decree on January 9, 1951 directing that the injunction *pendente lite* be made perpetual "insofar and to the extent *only* that said injunction applies to prosecuting any action against the policy arising *contractually* under said insurance policy No. 657,697, or to recover said fund of $5,822.83, or any part thereof, arising under said insurance policy No. 657,697 now deposited in the registry of the court, *but said injunction is not further or otherwise perpetuated.*" (Italics supplied)

Manifestly the District Judge did not think that the preliminary injunction was aimed only at suits on the policy sounding in contract, for otherwise he would have simply converted the preliminary into a perpetual injunction, and he would not have ordered that the preliminary injunction should be made perpetual only in part. Since the District Judge himself held the opinion that the preliminary injunction was not restricted to suits on the insurance contract itself but covered a wider field, how can we find fault with a litigant who took the same view? Certainly there is no impropriety in placing a heavy burden of proof upon a litigant who seeks to escape the consequence of his fraud by pleading the statute of limitations. We should hold that the running of the period of limitations was stayed by the injunction.

The second reason is based on the established law in West Virginia that the right to recover money paid under fraud accrues when the fraud is discovered or by the exercise of due care ought to have been discovered. See Matthews v. Dale, 118 W.Va. 303, 190 S.E. 338. In this case it has been said that the fraud was actually discovered on May 9, 1949, when the Bank was first notified of the prior assignment of the policy to the wife, and that the details of that assignment were clearly shown on August 23, 1949 in Mrs. Lallemant's answer in the interpleader suit. It would be more accurate to say that the Bank had notice at that time that it had been deceived, but that it did not know that it had been defrauded until the interpleader suit went against it on January 9, 1951.

We must bear in mind that the policy contained the following provision relating to assignments:

"Assignment.—No Assignment shall be binding upon the Company until the original or a duplicate thereof is filed at its Head Office. The Company assumes no obligation as to the effect, sufficiency, or validity of any assignment."

Hence the Bank had good reason to believe that its assignment, which was filed at the head office of the Company, took precedence over the wife's assignment which was never filed at all. The District Judge took the position, 95 F.Supp. 276, 282, that the Insurance Company by filing the interpleader suit waived the provision of the policy that an assignment in order to be binding upon the Company must be filed in its head office. The basis of this ruling is not beyond question, since the obvious purpose of the interpleader suit was to avoid all responsibility and to impose upon the court the duty of deciding between the rival claimants. The Company made no express waiver and left it to the court to decide the controversy. It follows that until the uncertainties of the litigated questions had been cleared up by a final decision of the court, the Bank had no means of know-

538

ing whether its assignment was good or bad or, in other words, whether it had been merely misled or had actually been defrauded by the misstatements of the representative of the Insurance Company. Under this view limitations did not begin to run until January 9, 1951 and the pending suit was in time.